Argued September 15; affirmed December 1, 1942

# HORN *v.* NATIONAL HOSPITAL ASSOCIATION
### (131 P. (2d) 455)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Gunther F. Krause,* of Portland (Victor R. Griggs, of Portland, on the brief), for appellant.

*Frank S. Senn,* of Portland (Senn & Recken, of Portland, on the brief), for respondent.

BRAND, J. If we were required to determine whether there was substantial evidence in support of plaintiff's allegation that the defendant, by its agents, undertook to diagnose the plaintiff's condition, a serious and difficult question would be involved by reason of the written contract, which purported on its face at least to limit the undertaking of the defendant to the payment of expenses for the services of persons designated by it, and which further purported to limit the liability of the defendant to the exercise of reasonable care in designating the doctors, etc., required for the purpose of the agreement. But in the view which we have taken of the evidence, it becomes unnecessary to pass upon this question.

Assuming for the purposes of this decision that the plaintiff did present evidence sufficient to go to the jury in support of her claim that the defendant, by its agents, did undertake to diagnose plaintiff's case, and assuming that she was not barred from such a contention by reason of the provisions of the written contract, and assuming further, but without deciding, that there was substantial evidence of negligence on the part of the defendant in failing to discover the diseased condition of her gall bladder, we will first consider whether or not the plaintiff has presented evidence sufficient to go to the jury for the purpose of proving that the plaintiff suffered damage as a proximate result of the alleged failure of the defendant to diagnose her condi-

tion. To that end a review of the testimony becomes necessary.

The plaintiff testified that she was in good health until about Thanksgiving day in November 1936. Her pleading, however, alleges that on March 8, 1937, she was suffering from a chronic gall bladder condition, and Dr. Hollenbeck testified concerning gall stones which were removed from her gall bladder on June 2, 1937, as follows:

"Q  Can you tell us anything about the time that it takes for stones of that size to develop?

"A  It would be purely speculation, but I would say years.

"Q  Years?

"A  Yes.

"Q  Could they, in your opinion, form in a period of two months?

"A  No, they could not."

After examining plaintiff's Exhibit 7, an X-ray taken on April 27, 1937, and which showed plaintiff's gall bladder, Dr. Hollenbeck testified further as follows:

"Q  Now, Doctor, I think you stated yesterday that the gall bladder showed a calcification or deposit of lime salts. What can you say about that process of calcification of the gall bladder, as much as you can tell from the X-ray there, as to how long that would be in the process of developing,—not any exact time but could you give us the range over which it might be expected to develop?

"A  Well, that is a very difficult thing to state but the situation as we see it here, virtually the calcification that we see, may have occurred years ago, a number of years ago, eight, ten, fifteen years ago.

"Q  But is that calcification of a gall bladder, of the walls of the gall bladder, is that a process that

takes place in a couple of months' time or does it take longer than that?

"A  Oh, it takes longer than that, I am sure. It is gradual.

"Q  Is it a very slow process, a very gradual process?

"A  Yes, very gradual.

"Q  And while it might have occurred years before this X-ray was taken, it would also have taken, in your opinion much more than a couple of months to calcify to the extent shown there?

"A  Yes, I feel definitely that it would, yes."

Viewing the testimony in the light most favorable to the plaintiff, it may be said that until late November 1936 she worked hard and felt and appeared well, but that unknown to herself she did have gall stones and a chronic gall bladder infection of long standing.

Beginning at Thanksgiving time 1936 plaintiff became sick. She had pain in the stomach and abdominal area. She was irritable, unable to eat, suffered from dizziness and extreme nervousness, sometimes turned white and became very weak. She vomited frequently and lost weight. She testified:

"* * * It just kept getting worse and it got to where I couldn't eat at all  * * *. Oh, I might eat some but I could expect to vomit nearly after every meal."

She suffered intensely. She was under the care of Dr. Jones of Redmond, in the months of December 1936, and January and February 1937. For two months she was confined in the hospital at Redmond. Her condition continued progressively worse until March 7, 1937, at which time Dr. Jones sent her to the National Hospital Association clinic "to find out what was wrong." She arrived at the clinic on Monday, March 8,

1937, and was examined over a period of four days. As a part of the examination an X-ray photograph was taken. Upon pressure in the region of the gall bladder, soreness was produced. The plaintiff's testimony discloses this as the point of greatest soreness. Dr. Goffin, however, who was called as a witness by plaintiff, testified that the patient's pain was localized over McBurney's point, "which we call the point right over the appendix." At that time she was suffering from distress in the abdominal tract and "from a great deal of nervousness."

> "* * * She was not in any pain much at that time, she was just nervous and she was not under an attack of gall stones either at that time, and so, finding out this tenderness over the appendix * * * I sent her to the X-ray department to confirm this tenderness over the appendix, * * *."

An opaque enema was there given, and an X-ray taken which was read by Dr. Butler, who found, as testified by Dr. Goffin, that

> "The point of tenderness was right over the appendix because he could see the appendix there and that also that the appendix was bulbous and somewhat poorly filled, which is the case sometimes with a chronic appendix."

Speaking of the condition of her appendix at the time of his examination, Dr. Goffin testified:

> "Her condition was not good for operation at that time. It was chronically inflamed, only in such a way as it did not show in the blood, so I advised her to wait and go back to her doctor, under observation, and if anything became acute he would attend to it, and then, if she did not get any results to come back and see us."

He advised the plaintiff and her husband that there was something wrong with her appendix but not to have it out. Plaintiff's Exhibit 10 also discloses that Dr. Goffin diagnosed her condition as constipation with probable appendicitis. This diagnosis finds support in the testimony of Dr. Hollenbeck, to whom the X-ray taken on March 10 at the defendant's clinic was exhibited. Upon examination of the film, Dr. Hollenbeck testified:

"* * * It shows here (indicating) what possibly one might take to be an appendix which, if so, has a very small lumen and shows several areas of constriction in the lumen.

"* * * Then if the appendix has filled here (indicating), of course, we can tell that this appendix has a very small, rather contracted lumen or inner surface, and that there are some constricted areas in this lumen. Here (indicating) is a narrowed area here, near the base of the appendix; a little larger here (indicating), and then on top it is even more contracted."

Following March 11, the last day of plaintiff's examination in defendant's office, the order of events becomes important. On March 12, she returned to Redmond at which time and place she again consulted Dr. Jones. Upon arrival in Redmond she was "worse all the time." Her husband testified that she was

"* * * Complaining terribly of her stomach and side, so Dr. Jones said that if it was her appendix that was the matter, that she must be operated on."

Plaintiff herself testified that Dr. Jones said:

"Don't take her out home because she will die before you get her back. If you do you will get her out there and you can't get her in in time to have those out; now, you have it out."

She continued:

> "And I said I wanted to know whether it looked like I could go for another few days because I was very tired, and he told Mr. Horn not to let me go, and so they kept me there."

As a result, her appendix was removed on March 13, the second day after leaving the defendant's clinic. Plaintiff introduced in evidence, as Exhibit 6, a report dated March 30, 1937, signed by Dr. Raymond F. Jones, which contained, among other things, the following information, under the heading of "Nature and Extent of Case (Information must be complete and definite)":

> "Chronic appendicitis and spastic colitis. March 13th pt operated for an acute attack of appendicitis. * * * This lady on March 8th was referred to the Portland Office for further examination. Pt returned from Portland March 12th, 1937 and had an acute attack of appendicitis. She was again put in the Redmond Hospital and operated March 13th, 1937 and remained in hospital until March 24."

The foregoing evidence concerning the condition of the appendix is undisputed.

Following the removal of plaintiff's appendix, her condition became worse. She remained in the hospital for two weeks, then returned to her home at Sisters, Oregon, where her symptoms remained the same. Side and stomach were painful, and vomiting continued. She remained at Sisters only for a day or two, then consulted Dr. Vandevert at Bend and was placed in the St. Charles hospital for about a week. While there, she continued to get worse, and Dr. Vandevert sent her to Dr. Sturdevant, of Portland, a specialist in neurology

and psychiatry. During this period her mental condition got very bad.

"She seemed to be suffering intensely and it seemed like nobody could pacify her or console her in any way. She just was almost raging."

Dr. Sturdevant examined her and placed her in the Emanuel hospital for two or three weeks, after which she was placed in the Gard Convalescent Home. During this period plaintiff complained of dizzy spells, pain in the stomach, "hot feelings" and constipation. Because of plaintiff's gastro-intestinal complaints, Dr. Sturdevant called in Dr. Hollenbeck, a specialist in diseases of the stomach and intestines. The gastroenterologist

"* * * Felt that he found pathology and that she had had an operation sometime before, and he thought the thing to do was to watch it and see what happened."

Subsequently, Dr. Sturdevant saw Dr. Vandevert in Bend, and after conference concluded that it would be advisable to go ahead and remove whatever pathology was in evidence. The pathology discovered by Dr. Hollenbeck was first disclosed by an X-ray taken on April 27, which showed a calcified gall bladder and what probably were gall stones. The X-ray is in evidence as Exhibit 7 and contains evidence supporting the diagnosis. She was again in the Emanuel hospital in Portland in May 1937. On June 2, 1937, at Bend, Oregon, Dr. Vandevert removed her gall bladder and gall stones of large size, which are in evidence. This operation occurred twelve weeks after the plaintiff left the defendant's clinic and five weeks after the taking of the X-ray which first disclosed the gall stones. There is testimony that the condition of the plaintiff was just about as bad during the year after the gall

stone operation as it had been before, but there was also evidence of some gradual improvement. She remained in the hospital twelve days after the gall stone operation. She was at the Emanuel hospital from August 1937 until October 1937. She returned to the hospital in November and remained until January 1938, when she returned to her home, resumed work and improved.

Between March 1937 and December 1939 the record discloses such a variety of ailments as is seldom found in a single individual. Space permits only that they be here catalogued. Concerning his findings prior to the gall bladder operation, Dr. Sturdevant testified:

"Well, from my point of view, from the psychiatric point of view, I felt that she represented an over reactivity to her symptoms, that is, I thought she had,—that they were making her weaker, and she had more symptoms than anything that you could demonstrate would justify. It is a thing that we call a neurasthenic trend, which is a neurasthenic type of illness. In my report to a doctor at that time I explained that this thing may be on the basis of ovarian deficiency and menopausal changes, and I also mentioned the fact that she had pathology in the gall bladder and that thing might ultimately have to be cared for * * *."

After the gall bladder had been removed, her stomach continued troubling her, and vomiting also continued for some time.

She was sent to Drs. Belknap and Hendershott, eye specialists, Dr. Fixott, dental expert, Dr. Jones, tonsil expert, Dr. Keane, stomach specialist. She was in the Emanuel hospital from August to October 1937, and again from November 27, 1937, to January 7, 1938. In

November 1937, a basal metabolism test caused Dr. Sturdevant to conclude that,

> "Possibly one of the factors in continuation of the complaints of weakness and inability to get started, was a deficient thyroid function, and she was given thyroid at that time."

In December 1937, she was given a gastroscopic examination in which the physicians looked at the stomach wall itself. She had an "irritable bowel" or colitis. Dr. Sturdevant testified that many of her conditions could be explained on the basis of ovarian deficiency and menopausal changes. She returned to Dr. Sturdevant every few weeks in 1938. Early in that year, she suffered from sore throat, and infected tonsils were removed. She had developed neuritis. An X-ray disclosed some arthritis in the cervical spine, and she was referred to another doctor for diathermy. Her teeth, jaws and sinuses were X-rayed. One doctor suspected a cyst in the jawbone. Dr. Sturdevant testified:

> "And then again the last time I saw her in the hospital was on October 26, 1938, at which time she came here and felt she needed to go into the hospital. She was tired and exhausted and had many of these vague and different complaints. Subsequent to this time and all through this time I saw her in the office. She was given things in an attempt to control her what was felt to be an irritable bowel; she was given thyroid. She was given ovarian substances because we felt that we were able to control symptoms which seemed to be related to the menopause with these ovarian substances and thyroid."

In October 1938, she had not fully recovered. On December 12, 1938, she began consulting Dr. Berger and continued under his treatment until 1940.

■ By way of summary, plaintiff's evidence discloses that she was in serious condition physically and in her nervous system and mind prior to her examination at defendant's clinic. There was definite pathology in several areas. Among many indicated ailments were those which related to gall bladder and to appendix. Much of plaintiff's evidence is directed toward proving that her diseased gall bladder was the cause or at least a contributing cause of the sickness and suffering, physical and mental, which was endured by plaintiff after March 11, 1937. There is substantial evidence that plaintiff's gall bladder affliction was a contributing cause of subsequent illness. If the evidence had shown that the defendant had negligently caused the plaintiff to have a diseased gall bladder instead of merely showing the failure to discover a pre-existing condition, it may be that the evidence would have presented a jury question, under the law as approved in *Merriam v. Hamilton*, 64 Or. 476, at p. 481, 130 P. 406 (1913):

> "Where there are two or more possible causes of an injury for one or more of which the defendant is not responsible, the plaintiff, in order to recover, must show by evidence that the injury was wholly or partly the result of that cause which would render the defendant liable. If the evidence in the case leaves it just as probable that the injury was the result of one cause as much as the other, the plaintiff cannot recover."

Even under such a hypothetical situation, a high degree of speculation would have been involved in attempting to estimate what part of her subsequent ailments were the proximate result of a diseased gall bladder, and what part resulted from her many other

afflictions. This is especially true in view of the testimony of plaintiff's witness, Dr. Sturdevant, as follows:

"Doctor, on all these conditions that you found there, no doctor could tell which one of them caused the condition of which she complained, could he?

"A  I don't think that you can say any one thing here. I think you have to take a pretty general look at a situation of this kind in order to properly evaluate it.

"Q  You couldn't give them a proper evaluation as one against the other, or say that this caused it or that caused it?

"A  Well, I don't think that you are doing justice in so doing."

But the defendant did not cause the diseased gall bladder. The plaintiff merely alleges that defendant failed to discover it. In the present state of the record, the evidence of a calcified gall bladder containing stones which probably formed gradually over a period of years and which condition contributed to her distress after March 1937, becomes an embarrassment and not an aid to the plaintiff's case, for that evidence of necessity adds a further speculative element to the problem which the plaintiff says should have been submitted to the jury. Not only would the jury have been required to segregate the harm suffered by reason of the diseased gall bladder from the harm resulting from the plaintiff's other multiple afflictions, but, having done so, it would still have to separate the harm which flowed from the diseased gall bladder and for which the defendant was in no way responsible from the alleged harm which flowed merely from the defendant's failure to discover the diseased gall bladder and the consequent delay in having it out. This would present a type of hyper-speculation utterly beyond the normal function of a jury.

The alleged acts and omissions of the defendant upon which the plaintiff relies occurred between the 8th and the 11th days of March 1937, both inclusive. In considering whether defendant's conduct was the proximate cause of harm to the plaintiff, the specific allegations of the complaint concerning negligence, proximate cause and damage must be considered, for it is only by presenting evidence of some harm which the complaint asserts to have been proximately caused by defendant's negligence that nonsuit may be avoided.

The alleged negligence is the failure to diagnose and advise plaintiff concerning her physical condition and particularly concerning her diseased gall bladder. It is to this failure therefore that the chain of proximate causation must be linked. Unlike cases in which affirmative injury is done in the very course of operating upon a patient, the mere failure here to diagnose and advise, in and of itself, caused no damage. Resulting damage could be made to appear only by showing other circumstances which rendered the failure harmful. The plaintiff, in recognition of this fact, was required to and did plead that the undiscovered chronic gall bladder condition was one "for which immediate medical and surgical treatment was indicated." The next step was to plead that the immediate treatment indicated as necessary would have been administered if the condition had been discovered. This, also, the plaintiff alleged in substance by pleading that, "Plaintiff, being ignorant of the nature of said condition, did not *at that time* obtain any medical or surgical treatment for the same." (Italics ours.) The last necessary element in the chain of causation is that the absence of medical or surgical treatment at that time resulted in damage which would not have occurred if the treatment had been administered. The plaintiff alleges that harm oc-

curred as a result of the nondiscovery of the gall bladder condition, but that allegation can only be true if the nondiscovery resulted in the alleged nontreatment. Turning from the pleading to the proof, we find that the gall bladder operation was performed three months after the defendant's alleged negligence, so the evidence required for the raising of a jury question was, first: evidence of the negligent nondiscovery of the gall bladder condition; second: the necessity for medical and surgical treatment at that time; third: that by reason of the nondiscovery the treatment was not administered at that time and not for three months thereafter, or in other words that the treatment would have been then administered but for the nondiscovery; fourth: that the delay of three months resulted in harm or damage which would not have occurred if there had been no delay, or in other words that the treatment, if administered at the time of the negligence, would have reduced the afflictions from which she actually suffered.

In the Restatement of the Law of Torts by the American Law Institute, it is said:

"(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if it would have been sustained even if the actor had not been negligent.

"Comment on Subsection (1):

a. If, without the actor's negligent conduct, the other would have sustained harm, the same in character and extent as that which he received, the actor's conduct, except in the situation dealt with in Subsection (2), not being even its necessary antecedent, is not a substantial factor in bringing it about.

b. The statement in this Subsection is most frequently, although not exclusively, applicable where

the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's person or land or chattels.'' Restatement of the Law of Torts, Vol. 2, § 432.

The exception to this rule, which is referred to in the text, relates to cases in which ''two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part'', and where ''each of itself is sufficient to bring about harm to another.'' That exception is not applicable to the case at bar, for the defendant's negligence was not *actively* operating, and defendant's negligence in failing to diagnose and advise is not ''of itself sufficient to bring about harm to the plaintiff.'' It must be borne in mind that there is no allegation in plaintiff's complaint that the plaintiff went to defendant for any treatment or operation or that the defendant ever undertook to treat her or operate upon her or that the defendant ever administered any treatment, whether proper or improper, to her.

Applying to plaintiff's case the four criteria above outlined and still assuming (1) that defendant negligently failed to discover and advise plaintiff of her gall bladder condition, we next inquire (2) if there was evidence to support the allegation that immediate medical and surgical treatment was indicated, in the sense of being then advisable or necessary. The evidence adduced by the plaintiff not only fails to support that allegation, but it affirmatively discloses the contrary. There is no evidence concerning the nature of any *medical* treatment used or that should have been used. No witness, expert or lay, testified that immediate removal of the gall bladder was necessary or advisable at that time. The mere discovery of a diseased

gall bladder, if made, would not in itself carry an inference that an immediate operation is necessary. If immediate operation was inadvisable, then the omission thereof could produce no evidence of damage caused by the omission. The evidence concerning the condition of plaintiff's appendix affirmatively discloses the inadvisability of an immediate gall bladder operation. The appendical condition discovered by Dr. Goffin at the clinic in March is verified by the other evidence which we have reviewed. There is no claim that the defendant caused the appendectomy to be performed, much less that such operation was improper or unnecessary. Dr. Goffin did not advise it. He testified in substance that from the symptoms displayed by the plaintiff,

"There were several things could happen: One is a renal colic probably and the other would be a chronic appendix and the other would be gall stones."

He testified further that he had that in mind and added:

"As a result of my examination I found the woman suffering more from a chronic appendical trouble than any other condition in her body, and also very nervous. Now, we know, as physicians, that the treatment of a condition like the gall bladder or gall stones and the appendix are diametrically opposed to each other. One will kill rather than cure. For instance, if this woman was given opium and purgative to get rid of her gall stones, and she had at the same time had a chronic appendicitis that should develop, probably actually she would have died, probably of peritonitis. So the thing to do at that time was to take care of the appendix and get that out of the way before anything else could be done. * * * Her condition was not good for operation

then because at that time it was chronically inflamed, only in such a way as did not show in the blood. So I advised her to wait and go back to her doctor under observation, and if anything became acute he would attend to it, and then if she didn't get any results to come back and see us.''

It was Dr. Jones in Redmond to whom she was referred who found her suffering from an acute attack of appendicitis and who insisted upon an immediate operation, without which, he warned, she would die. That operation occurred two days after she left the defendant's clinic. Since there is no allegation that the defendant negligently or otherwise caused the appendectomy, it follows that that operation was merely a circumstance having an important bearing upon the advisability of an immediate second operation for gall stones. There is not a syllable of evidence to the effect that if the fact of the gall bladder had been discovered on March 11, an operation for the removal thereof should have been performed on the 12th. The appendix was removed on the 13th.

Dr. Sturdevant testified that Dr. Hollenbeck, after discovering the gall stones on April 27, recommended that the operation be postponed and that she be treated conservatively and that ultimately it would have to be done. Concerning the suggested necessity of an immediate operation for gall stones, Dr. Sturdevant, speaking of himself and Dr. Hollenbeck, said:

''Well, she had had some surgery not long before and we were hoping that she might improve by making an outside adjustment again and by the management that we had her on, by her bowel management and one thing and another, we could get rid of these symptoms. Even though we had evidence in X-ray of actual pathology, we thought that method or that procedure should be followed before

more radical surgical procedure should have followed, followed through on.''

It is true that one of several reasons given by Dr. Hollenbeck for delay in removal of the gall bladder even after April 1937 was the fact that she had recently had her appendix removed, but there is no evidence that the appendix would not or should not have been first removed on March 13 even if the diseased gall bladder had been discovered on March 11. We conclude that the plaintiff has failed to show that either immediate or approximately immediate surgery was required at the time of the examination at the defendant's clinic.

We also find (3) a failure of any proof that the gall bladder would have been removed either at or soon after the time the plaintiff left the clinic even if the pathology had been there discovered. The evidence which we have just reviewed indicates that it would not. But further, plaintiff did not testify that she would have submitted to an immediate operation for the removal of the gall bladder even if defendant had diagnosed that condition and informed her of it, nor did anyone else so testify. At this point, it must be recalled that the complaint contains no charge that the defendant undertook to operate or failed to operate, but only charges a failure to diagnose and advise. Plaintiff's case rests upon the assumption, unsupported by evidence, that the plaintiff, if informed of her condition and of the necessity of an immediate operation, would have caused someone to perform it. The evidence discloses that the plaintiff was suffering in mind as well as in body and was shortly thereafter under the care of a psychiatrist. Concerning the occasion when she was in the hospital at Redmond on the night of

March 12 and after Dr. Jones had given warning that if she went home she would die before she could get back, plaintiff testified:

> "Well, Dr. Jones had a patient in there that night that was,—he was with until 3:00 o'clock in the morning, and it was such a commotion that I couldn't get to sleep, and at 3:00 o'clock I went out, and I just decided that if he had been up all night that I didn't really want him to operate on me in the morning, so I just walked out and went down to where my husband was.
>
> "Q  You walked out of the hospital and where did you go?
>
> "A  Down to the hotel where my husband was.
>
> "Q  Did you go back the next morning for the operation?
>
> "A  Yes, Dr. Jones said he would have,—he called up and he said he would have the state cops after me if I wasn't back there right away."

Such testimony concerning the appendectomy, instead of supporting her claim that an immediate operation for gall stones would have been performed, tends to indicate that the time at which she might have submitted to an operation is at best a matter of pure speculation.

The evidence fails (4) to show that the alleged delay of three months in removal of the gall bladder resulted in harm or damage which would not have occurred if there had been no delay. Even if we ignore the hiatuses in the chain of causation already noted, the most that could be claimed would be that the defendant would be responsible for any damage caused by the delay in discovering the pathology of the gall bladder. That period is not three months, but only from March 11 to April 27, when Dr. Hollenbeck discovered the condition.

One definite attempt was made by the plaintiff to introduce expert evidence of injury to the plaintiff by reason of the alleged delay in operating, alleged to have been caused by the failure of the defendant to discover the gall bladder condition. Counsel for the plaintiff in a hypothetical question addressed to Dr. Alan Welch Smith, asked the doctor to assume that reasonable care on the part of the defendant would have discovered the gall bladder condition about March 8, 1937. Counsel then stated:

"* * * And my question is, what injury, in your opinion, was done to the plaintiff in failing to discover that gall bladder condition until April 27, 1937, and the failure to operate prior to that time?"

In the first place, the question could present no evidence which could be properly considered by a jury because it included the alleged failure to operate as well as the alleged failure to discover. No question of failure to operate is presented by the pleadings. However, the only answer given by Dr. Smith to the hypothetical question was as follows:

"That is a very hard question to answer positively yes or positively no. Cases of that kind are dependent altogether upon the amount of disorder or of pressure symptoms, interference, and the age of the patient."

The doctor added:

"* * * You can have some gall stones and never be conscious of them until some interference, * * *."

Counsel pressed the matter further, and the court ultimately asked the witness the following question:

"* * * Could you express an opinion as to the extent or nature of injury that this lady had suf-

fered over a period of six weeks by reason of the continued presence in her gall bladder of these gall stones?

"A I think from a theoretical standpoint it is practically impossible to say, but from a practical standpoint these doctors that had been attending her would know whether there was any interference with the bile passing, he would know in what condition she was in and whether it did interfere with her."

■ The foregoing is the only evidence directed to the specific question of the effect, if any, of the delay in the discovery of the pathology in, or in the removal of plaintiff's gall bladder. That testimony falls short of being substantial evidence that the alleged negligence of the defendant corporation, if any, in failing to diagnose and advise the plaintiff was the proximate cause of any injury to her.

■ Counsel for the plaintiff cite the case of *Woods v. Wikstrom*, 67 Or. 581, 135 P. 192, (1913), as holding that a nonsuit cannot be granted unless there is no evidence to support a verdict. The rule in this jurisdiction is now firmly established that if there is no substantial evidence tending to establish any one of the essential elements, a cause of action should not be submitted to the jury. The controversy between the substantial evidence and the scintilla rule must be deemed to be finally put at rest. *Bogart v. Cohen-Anderson Motor Co., Inc.*, 164 Or. 233, 98 P. (2d) 720 (1940) ; *Hisey v. State Ind. Acc. Com.*, 163 Or. 696, 99 P. (2d) 475, (1940) ; *Ylvich v. Kalafate*, 162 Or. 365, 92 P. (2d) 178 (1939) ; *Vale v. State Ind. Acc. Com.*, 160 Or. 569, 86 P. (2d) 956 (1939) ; *Holland v. Eugene Hospital*, 127 Or. 256, 270 P. (2d) 784 (1928) ; *Hamilton v. Kelsey*, 126 Or. 26, 268 P. 750 (1928).

■ Where the alleged negligence of the defendant consisted of physical non-feasance, that is, where the defendant did no physical act which affected plaintiff's condition, and the negligence, if any, was the failure to diagnose and advise, it is not sufficient for a plaintiff to show subsequent ailments and rest his case upon the specious doctrine of *post hoc ergo propter hoc*. One must go further and show that competent action would have been substituted for negligent inaction, and that there was a reasonable probability that the subsequent ailments would have been less if the substitution had been made.

■ Uncertainty as to the amount of damages will not always prevent recovery, but where the causal connection between the negligent failure of a defendant and subsequent ailments of a plaintiff is left to mere speculation, a nonsuit is required. Our conclusion is supported by the following authorities: *Giusti v. Weston Co.*, 165 Or. 525 at p. 534, 108 P. (2d) 1010 (1941); *McKay v. State Ind. Acc. Com.*, 161 Or. 191, 87 P. (2d) 202 (1939); *Vale v. State Ind. Acc. Com.* (supra); *Chapman v. General Petroleum Corporation*, 152 Or. 147, 52 P. (2d) 190 (1935); *Doumitt v. Diemer*, 144 Or. 36, 23 P. (2d) 918 (1933); *Blanchard v. Makinster*, 137 Or. 58, 290 P. 1098, 1 P. (2d) 583; *Lippold v. Kidd*, 126 Or. 160, 269 P. 210, 59 A. L. R. 875 (1928); *Spain v. O. W. R. N.*, 78 Or. 355, 153 P. 470, Ann. Cas. 1917E, 1104 (1915).

The plaintiff has supported his contention on the issue of proximate cause by the citation of two cases: *Merriam v. Hamilton* (supra) from which we have quoted with approval. The rule stated in that case is not inconsistent with our conclusions here. The other case cited by the plaintiff is *Coffey v. Northwestern Hospital Association*, 96 Or. 100, 183 P. 762, 189 P. 407

(1920). That case was an action for breach of a contract to furnish plaintiff *medical and surgical services in case of illness.* The complaint alleged that plaintiff was suffering from sickness which required operative treatment which the defendant had contracted to give, but refused to administer. Upon rehearing, this court observed that when at a later time she obtained medical assistance she was speedily relieved of much of her pain and was substantially cured of her trouble. The court said: These facts were evidence from which a jury might infer and almost necessarily would infer that a prompt compliance by the association with the request of plaintiff for treatment would have saved her unnecessary suffering. It was held that the question of proximate cause was properly submitted to the jury. The court also said:

> "It may be conceded, for the purposes of this case, that in the absence of any evidence tending to show that plaintiff's sufferings were prolonged by defendant's breach of its contract, she would not be permitted to recover for physical pain resulting as a necessary consequence of the disease, irrespective of such breach. In other words, if plaintiff suffered to no greater extent than she would, had defendant promptly treated her, then she can recover nothing for such physical pain. But that is not this case."

That was a case in which the defendant had an immediate duty to perform physical acts of surgery and which if performed would have relieved the plaintiff of suffering. The identical elements which were found to be present in the Coffey case are wholly lacking in the case at bar for the reasons which we have indicated.

Motion for nonsuit was properly granted.

ROSSMAN, J. (specially concurring). Although I believe that the circuit court was justified in sustaining the defendant's motion for a nonsuit, I do not concur in the majority's reasoning, and believe that their statement of the facts contains errors.

The majority assume that the defendant (a) owed the plaintiff a duty; and (b) breached the duty. After the majority have engaged in those assumptions they declare that the evidence does not show that the defendant's breach of its duty to the plaintiff caused her any damage, and therefore conclude that she failed to establish a cause of action. It must be borne in mind that the only ruling made by the circuit court which is under attack sustained the defendant's motion for a nonsuit. The case did not get beyond that point.

As we all know, a cause of action consists of (a) a duty owed by the defendant to the plaintiff; (b) a breach of that duty by the defendant; and (c) damage to the plaintiff as the proximate result of the breach. When all three have been established, a nonsuit cannot be ordered.

In order to establish a cause of action, a plaintiff need not prove large damages. If it appears that he is entitled to recover only nominal damages, a nonsuit cannot be directed. Accordingly, in this case, if it appeared when the plaintiff rested that she was entitled to recover a judgment for one dollar, the motion for nonsuit should have been denied. That is necessarily true because a complaint which prays for a judgment for one dollar only is not subject to demurrer because of the small sum sought.

Let us now see whether the record showed, when the plaintiff rested, that she had sustained any damage from the negligent failure to diagnose her illness correctly.

In *Smith v. Pallay*, 130 Or. 282, 279 P. 279, this court said:

"Some damages are always presumed to follow from the violation of any right or duty implied by law."

In *Lee, Inc., v. Pacific Telephone & Telegraph Co.*, 154 Or. 272, 59 P. (2d) 683, we said:

"Whether the plaintiff can show, upon trial, that it has sustained any actual damage by reason of the mistake complained of is a matter of future determination, but the rule is well established that nominal damages may be recovered for the bare infringement of a right unaccompanied by any actual damage."

From Sherman and Redfield on Negligence, Rev. ed., § 836, the following is taken:

"When a plaintiff alleges that his person has been injured and proves the allegation, the law implies damages."

The following was taken from 25 C. J. S., Damages, § 6, page 465:

"Where the evidence shows the violation or infringement of a legal right, the law will presume damages sufficient to sustain an action."

If this action is based upon the contract which the plaintiff's husband and the defendant signed—and I believe that it is—then it is clear that the plaintiff was entitled to recover at least nominal damages, for in an action for a breach of contract damage is always inferred: *Rainier v. Masters*, 79 Or. 534, 154 P. 426, 155 P. 1107, L. R. A. 1916E, 1175; and Sedgwick on Damages, 9th ed., §§ 97, 98 and 106. Upon the other hand, if this is an action of tort in the nature of one upon the case, then also the plaintiff was entitled to

receive from the defendant at least nominal damages, and therefore the motion for a nonsuit should have been denied. See, in addition to the above authorities, especially McCormick on Damages, §§ 22 and 23.

It must be remembered that this cause is before us upon an order which sustained the defendant's motion for a nonsuit. Therefore, since the plaintiff was entitled to recover at least nominal damages (provided the defendant breached a duty which it owed to the plaintiff), the motion should have been denied.

It is true that this court has sustained an order directing a nonsuit notwithstanding the fact that the plaintiff was possibly entitled to receive nominal damages: *Edd v. Western Union Telegraph Co.*, 127 Or. 500, 272 P. 895; and see also *Lippold v. Kidd*, 126 Or. 160, 269 P. 210, 59 A. L. R. 875. In the latter decision the statement about the motion for a nonsuit was unnecessary. The Edd decision was based upon the maxim de minimis; under it a reversal will not be ordered for the sole purpose of enabling a party to recover a judgment of only one dollar. But if the entry of a judgment for nominal damages will establish title to real property, vindicate some right, permit the recovery of costs; or have some other similar effect, the erroneous allowance of a nonsuit will be deemed reversible error: 3 Am. Jur., Appeal and Error, § 1004, page 559; and 5 C. J. S., Appeal and Error, § 1914, page 1415.

My reading of the record convinces me that it contains substantial evidence showing that the alleged failure of Dr. Goffin to properly diagnose the plaintiff's illness caused her to undergo much suffering. I am convinced that compensatory damages could be awarded if it were shown that the physician just mentioned was the defendant's employee.

It seems desirable to take brief note of the illness from which the plaintiff suffered when she entered the defendant's office. The majority's opinion, I believe, attributes to her more illnesses that were not connected with her diseased gall bladder than the record warrants. I also believe that the paper signed by Dr. Jones, and from which the majority quote in support of their statement that the plaintiff was afflicted with an acute attack of appendicitis just before Dr. Jones removed her appendix, cannot be used for that purpose. It must be borne in mind that Dr. Goffin's four-day examination of the plaintiff disclosed no condition of the appendix requiring an operation. He was asked, and answered, as follows:

"Q. You wouldn't consider that it needed an operation at that time?

"A. I wouldn't until it was necessary, no; she might,—it might clear up and be all right again."

Dr. Goffin's written report of his findings said: "Diagnosis: Constipation with probable chronic appendicitis. Treatment: Diet and medication." Dr. Butler, the X-ray specialist who examined the plaintiff (March 9, 1937), gave her what he termed an "opaque enema" preparatory to his examination, and after the latter reported in writing his findings as follows: "Appendix was partially filled and tender on pressure." In weighing the effect of the words "tender on pressure", it must be remembered that the plaintiff had had for months severe pains in the abdomen, had vomited after virtually every meal, and that the record indicates that this distress was the result of her diseased gall bladder. Two days after Dr. Goffin had analyzed the plaintiff's condition as "Constipation with probable chronic appendicitis," Dr. Jones, with-

out having made any additional examination, removed the appendix. Dr. Jones did not testify. The paper upon which the majority rely was not a hospital chart nor any other sort of medical record. It was nothing more than a bill for Dr. Jones' services which he sent to the defendant. It was written upon a printed form supplied by the defendant to physicians who performed services for which they expected the defendant to pay. The purpose of the forms was to enable the physician to present his account in itemized form to the defendant and obtain payment for his services. The heading of the paper is "National Hospital Association." Shortly there follow these lines: "Please give information requested below as completely as possible and submit bill as soon as patient is discharged." Those words are followed by a space in which the physician is required to make an itemized statement of his services and charge. The space is divided into three columns entitled, respectively, Date of Treatment, Nature of Treatment Rendered Must Be Shown, and Charges. In the first column Dr. Jones entered a notation for each visit which the plaintiff made to his office. In the second he entered the words which the majority quote about the plaintiff's acute attack of appendicitis. In the third he entered the charges which he had made, including $50 for the operation. The charges totaled $75.50. After he had made these entries he mailed the paper to the defendant in order to obtain from it payment for his services.

It is evident that the entries upon the sheet in question were not made in the regular course of duty, like those upon a hospital chart—all of them were made at the same time. I know of no rule of law which makes any entry upon this paper evidence against the plaintiff

of the truth of the entry. Although the plaintiff did not state the purpose to which she expected to apply this paper upon its reception in evidence, it is very clear that she did not offer it for the purpose of showing that she was afflicted with appendicitis. Her purpose, manifestly, was to show that the defendant had undertaken to render medical service to her. She thought that the defendant's possession of this paper and its payment of Dr. Jones' charges would support her contention that the defendant had taken her case into its care. Without further analysis, I express my conclusion that the use of this paper for the purpose of showing the condition of the plaintiff is unwarranted. I think that it is especially unwarranted when we are determining what action should be taken upon a motion for a nonsuit.

The majority, after quoting from the statement of account rendered by Dr. Jones to the defendant (described in the preceding paragraph), say: "The foregoing evidence concerning the condition of the appendix is undisputed." I do not concur in that statement, and believe that the record contains substantial evidence showing that the plaintiff's appendix was not diseased and that it was not the cause of her illness. However, a continuance of the discussion is unnecessary.

If it is sought to say that the failure to discover the gall bladder condition was neutralized by the weakened condition caused by the appendix operation, then, I believe that we ought to say that the record presented an issue as to whether or not the claim made by the defendant that she was suffering from appendicitis was true. I repeat, Dr. Goffin's diagnosis was "probable chronic appendicitis," and that there is

evidence in the record which shows that the gall stones, and not the appendix, was the cause of the plaintiff's suffering.

As already stated, I believe that the record contains substantial evidence showing that the failure of the physicians to properly diagnose the plaintiff's illness entitled her to an award of compensatory damages if the defendant is liable to her. But, since I do not believe that the defendant is liable for the damage, an extensive review of the evidence showing damage is not necessary. The following, however, may be in order. It will be remembered that the plaintiff called upon Dr. Goffin March 8 to 12, 1937. Dr. Goffin failed, however, to discover the gall stones and, in fact, ordered no X-ray photographs of the gall bladder region. He testified that he found that the plaintiff was "suffering more from a chronic appendical trouble than any other condition of her body, and also very nervous. * * * So I advised her to wait and go back to her other doctor." The plaintiff testified that Dr. Goffin gave her "a bottle of some tablets for me to take and he said for me to go home and take them, and he says, 'You will be all right.' " It will be noticed that he did not advise a removal of her appendix. Dr. Goffin swore that his examination of the plaintiff showed that her chest, heart and lungs were normal; she met successfully the blood test, urine test, etc. He found that she was, however, "a very sensitive woman and of a very delicate,—what we call a sympathetic nervous system, * * * Otherwise she was quite strong constitutionally." He did not claim that she could not have undergone a gall bladder operation had he discovered the need for one. Such being the situation, is it not reasonable to infer that if Dr. Goffin had discovered the aggravated condition of the plaintiff's

gall bladder before she left his office he would have advised some immediate action concerning it? He swore that her symptoms were as indicative of gall stones as of appendicial trouble. It seems to me that the answer to the question just stated must be in the affirmative. Had he discovered the diseased gall bladder, it is common sense to say that he would not have inferred that her suffering was due to a "probable chronic appendicitis." The words in quotation were taken from Dr. Goffin's written findings. And had something then been done about her gall bladder the agonizing suffering which this woman endured in the succeeding weeks would have been avoided. I repeat, before Dr. Jones removed the plaintiff's appendix her condition had not changed and he made no further examination. Thus, I believe that the record contains evidence showing that the failure to properly diagnose her condition subjected the plaintiff to compensatory damages. For the foregoing reasons, I cannot concur in the statements made in the opinion of the majority nor in their reasoning.

Let us now determine whether the defendant was responsible for the damages which followed from the failure to exercise due care in making the diagnosis. It could not be responsible for the damages unless Dr. Goffin was its employee. It seems desirable at the outset to take notice of two statements which appear in the majority's opinion. One is: "Dr. Jones sent her to the National Hospital Association clinic 'to find out what was wrong.' She arrived at the clinic on Monday, March 8th, 1937." The other statement is: "Following March 11th, the last of plaintiff's examinations in defendant's office, * * *." That statement indicates that examinations by a physician were made in

the defendant's office. Let us see whether the defendant maintained a clinic and whether any examinations of the plaintiff were made by physicians in the defendant's office.

The defendant, according to Mr. C. C. Bechtold, its manager, maintains in the Mohawk building in Portland general offices, together with "an X-ray department, a laboratory, a drug department, physiotherapy." In the same building Dr. Goffin is located. His equipment is his own and he himself pays the rent for the two rooms which he occupies. "He is compensated," according to Mr. Bechtold, "on a monthly retainer and also is paid on a fee basis for work that he does, depending on the work he does." Dr. Goffin said that he was compensated with "a monthly fee," although, in response to the questioning of plaintiff's counsel, he adopted the word "salary". In consideration of it he attended to persons who were sent to him by the defendant. Dr. Goffin receives, in addition to the persons sent to him by the defendant, patients who come to him independently of the defendant. He estimated that twenty-five per cent of his time was consumed with individuals who were sent to him by the defendant and that the other seventy-five per cent was consumed with other patients. According to Mr. Bechtold, Dr. Goffin "gets paid more if he handles patients in the hospitals or the sanitariums, depending on the work that he does." Those sent to Dr. Goffin by the defendant's office were not required to accept him as their physician, but were at liberty to go to any other physician whose name was upon the defendant's list.

Mr. Bechtold testified that Dr. Frank Butler "has charge of the X-ray department, he makes oral fluoroscope examinations." For that purpose he, like Dr.

Goffin, was paid a monthly salary. Although the testimony is scant, it seems that Dr. Butler, like Dr. Goffin, devoted only a part of his time to persons sent by the defendant. Mr. Bechtold further testified that the X-ray work was done by "a technician that takes X-rays. She doesn't do the fluoroscopic work."

The facts just mentioned are the only ones in the record which indicate whether or not the defendant maintained a clinic. The operation of X-ray machines does not constitute the practice of medicine: *Doumitt v. Diemer*, 144 Or. 36, 23 P. (2d) 918. I believe that the foregoing facts do not show that the defendant operated or maintained a clinic. I also believe that the plaintiff was not given a medical examination in any office kept by the defendant.

Let us now revert to the contract between the defendant and the plaintiff's husband. It was signed by the contracting parties June 1, 1936. The husband was in the logging business and the plaintiff did the cooking for about twenty-five men who were in her husband's employ. The contract refers to the defendant by the designation "the Medical Contractor." It says:

"The Medical Contractor hereby promises and agrees to bear the expense of Medical and Surgical Services, Services by Specialists, Hospital Care, Medicines, Surgical Supplies and Orthopedic Appliances, Nursing, Dental Services, Ambulance, X-ray and Clinical Laboratory Diagnoses, Physical Therapy and Prophylaxes for the employes of the Employer engaged in its sawmill and logging operations in the State of Oregon by Physicians and Surgeons and Specialists, Hospitals, Druggists and/or other parties designated by the Medical Contractor, and subject to the provisions, conditions and limitations contained in this agreement. * * * provided that the liability of the Medical Contractor

hereunder is limited to reasonable care in designating doctors, hospitals, nurses, druggists and/or other parties required for the purposes of this agreement; it being understood, however, that the doctors, hospitals and/or other parties designated by the Medical Contractor shall be acceptable to the Employer. Employes hereunder shall have the right to apply to any Physician, Surgeon, Hospital and/or other party designated by the Medical Contractor in its several districts; * * * The benefits of this agreement are hereby extended to apply, for present employes, to * * * Chronic Conditions such as * * * Gall Bladder Conditions, * * * excepting for conditions enumerated in this provision that become active or manifestly existing on the date hereof."

The above is the opening paragraph of the contract. The other paragraphs are largely explanatory. It will be observed from the language just quoted that the defendant did not undertake to provide medical treatment for anyone. It went no further than to promise (a) to maintain lists of competent physicians to whom workmen could go when they needed attention; and (b) to pay physicians after they had rendered service to workmen. The plaintiff makes no contention that the defendant had contracts with physicians whose names appeared upon its lists whereby it could exercise control or direction over them.

When the plaintiff became ill she went to Dr. Jones in Redmond and asked for his professional services. Dr. Jones was upon the defendant's accredited list of physicians, and therefore his services were available to her and to all workmen whose employers had contracted with the defendant. Before the plaintiff called upon Dr. Jones neither she nor her husband had asked the defendant whether she could avail herself of that

privilege. The contract itself entitled the employee to select any physician upon the defendant's list, and rendered the defendant responsible for the charge. When the plaintiff called upon Dr. Jones she brought with her a paper which the witnesses termed a ticket. A book of them was delivered by the defendant to Mr. Horn when the contract was signed. When an employee became ill he was issued one of the tickets and it constituted the physician's authority for rendering service at the defendant's expense.

It is seen from the foregoing that Dr. Jones was selected by the plaintiff. She makes no claim against the defendant on account of that physician's course of treatment. We add that when he failed to effect a cure he advised the plaintiff to go to the defendant's Portland office, explaining, so the plaintiff said, that ''they had better equipment and things to find out what was wrong.''

Whether a person who was receiving the services of a general practitioner, like Dr. Jones, should have the attention of a specialist was a question, according to Mr. Bechtold, to be ''determined by the doctor who has the patient.'' He swore that Dr. Goffin was not the only specialist in Portland to whom patients were referred, and added that a patient was at liberty to change physicians with the same freedom as if the defendant were not liable for payment.

March 8 the plaintiff and her husband entered the defendant's office and there Mr. Horn talked to a person by the name of Page who was in charge. Mr. Page referred the plaintiff to Dr. Goffin. Possibly it is unnecessary to add that no one contends that Mr. Horn and Mr. Page entered into a new contract in their brief discussion. Mr. Horn was merely trying to find out

how his wife should proceed to obtain, at the defendant's expense, a diagnosis by a specialist.

When the plaintiff entered Dr. Goffin's office she described her illness and gave its history. Dr. Goffin examined her heart, lungs, chest and abdomen. Then the plaintiff visited the defendant's laboratory where some specimens of her blood and urine were examined. The second day the plaintiff visited the defendant's X-ray department where an X-ray negative was made of her abdomen and fluoroscopic examinations were made of some other regions of her body. The third day the examinations were continued and upon the fourth day Dr. Goffin reported to the plaintiff and her husband his findings.

Whether, in any case, a blood or urine test should be made or X-ray examinations conducted was, according to Mr. Bechtold, a question solely for the physician. He explained that "the attending doctor uses his own judgment about it. He handles it just the same as he would a private patient." The results of blood and urine tests, of X-ray examinations, etc., were not sent to the defendant, but were given either to the patient or to his physician. In the present instance, according to Mr. Bechtold, all of the tests that were made were ordered by Dr. Goffin, and the results were sent to him.

There is no claim that the defendant's X-ray department failed to take the pictures and make the fluoroscopic examinations in exact conformity to Dr. Goffin's directions. Nor is there any claim that Dr. Butler neglected to read properly the X-ray plate which his department made upon Dr. Goffin's order. Likewise, the plaintiff does not argue that the defendant's laboratory made an incorrect analysis of the specimens which Dr. Goffin sent to it. The sole con-

tention submitted by the plaintiff is that Dr. Goffin in making his diagnosis omitted an examination of the plaintiff's gall bladder.

The question now presents itself: Was Dr. Goffin the defendant's employee when he made the diagnosis; that is, was he the defendant's alter ego when the negligent omission took place? If the answer is no, the defendant is not liable and the motion for the nonsuit was properly sustained.

In this case, unlike in *Giusti v. Weston Co.*, 165 Or. 525, 108 P. (2d) 1010, the defendant did not undertake to provide medical, surgical or hospital service for anyone. The decision in that case quoted from the contract which that defendant signed, as follows:

> "* * * provide medical and surgical and hospital services, including dental services, medicines, medical and surgical appliances * * *."

In the case now before us the defendant agreed to do nothing more than to

> "bear the expense of Medical and Surgical Services, Services by Specialists, Hospital Care, Medicines, Surgical Supplies and Orthopedic Appliances * * *."

The record affords no basis for a finding that the defendant went beyond its contract and selected a physician for the plaintiff. The brief conversation which took place on March 8 between Mr. Horn and Mr. Page was merely a means of putting the contract into operation so far as the services of a specialist were concerned. The plaintiff was at liberty to accept or reject Dr. Goffin as she saw fit. There is no claim that the defendant interfered with or directed Dr. Goffin in his diagnosis of the plaintiff's condition. So far as the evidence discloses, Dr. Goffin was free to proceed in

any way that his sense of duty and professional responsibility dictated. It is clear that the defendant did not limit Dr. Goffin in the amount of attention which he could give to the plaintiff. It will be recalled that he devoted a part of each of four days to the plaintiff's case and that there was available to him the facilities of a laboratory and of an X-ray department. No one limited him in the use of those facilities and he made such use of them as he thought was necessary. It is true that he did not order an X-ray examination of the plaintiff's gall bladder, but it is clear that his omission to ask for such an examination was not in any way the result of anything which the defendant did or neglected to do.

The record demands a finding that Dr. Goffin determined not only what he should do in diagnosing the plaintiff's condition, but also how he should do it. All of this was left exclusively to his judgment.

The plaintiff, in arguing that Dr. Goffin was the defendant's employee, does not lay stress upon the fact that he received monthly compensation from the defendant for the services which he performed. Month by month he took care of people for whose medical attention the defendant was liable and, accordingly, month by month, it was indebted to him. An independent contractor, as well as an agent, is paid for the work which he performs; and the manner of payment is rarely controlling.

There is no touchstone by which an agent can be readily distinguished from an independent contractor. Both perform work, both are paid for what they do, and both sustain relations with others. An agent performs a service, whereas an independent contractor produces a result. The agent as he proceeds with his

work is under direction and control. The independent contractor, having agreed to do nothing except produce a result, is "his own boss." Agents frequently work upon the premises of their principals. Independent contractors generally have offices or headquarters of their own. Since an agent acts under the advice and control of his principal, he is generally engaged in a calling which lends itself to such control. An independent contractor often is engaged in a type of activity in which control or supervision by outside sources would be highly undesirable, as, for instance, the calling of a medical specialist.

Normally, the physician falls within the category of an independent contractor, but he may make himself the agent or the employee of someone who sends him to perform medical service for another. *Giusti v. Weston Co.*, supra, and *Jenkins v. General Hospital*, 90 W. Va. 230, 110 S. E. 560, 22 A. L. R. 323, the two decisions upon which the plaintiff particularly relies, are each an instance in which the physician had become an employee of an organization which, in turn, was required to perform medical services for others. Being an employee, the physician was necessarily subject to the control of his employer; therefore, the latter was responsible for the physician's malpractice under the doctrine of respondeat superior. The facts in each of those cases are readily distinguishable from those in the instant case.

If a physician sent by a person to perform medical service for another is not the employee of the one who sent him and is not subject to his direction, the negligence of the physician will not be imputed to the person who sent him, unless he was incompetent and that fact was known. See 41 Am. Jur., Physicians and Surgeons, page 223, § 112.

In the present instance, the fact that Dr. Goffin monthly received compensation from the defendant for his work cannot of itself demand a holding that he was the defendant's employee. The facts that he performed his work upon his own premises, and that his calling as a specialist demanded that he be left free from control, are persuasive that he was an independent contractor. But the fact that the defendant's contract required it to do nothing except to pay for services performed, and that it reserved to itself no right to exercise control over the person for whose services it was required to pay, in my belief, settles this case and demands a holding that Dr. Goffin was not the defendant's employee.

The plaintiff availed herself of the rights afforded by the contract under review. It gave her the privilege of securing medical attention at the defendant's expense. She, however, took those rights as she found them; that is, as they were meted out by the contract which her husband and the defendant had signed. One of the limitations upon the contractual rights was that the defendant should be liable to her only in the event that it failed to exercise reasonable care "in designating Doctors, Hospitals, Nurses, * * *." It is not claimed, however, that the defendant breached that provision of the contract. For the following two reasons I believe that the motion for the nonsuit was properly sustained: (1) Dr. Goffin was not the defendant's employee; and (2) the liability limitation clause exempts the defendant from liability.